**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 05-CR-10109-WGY |
| | ) | |
| JOSE A. RUIZ-MORALES | ) | |

<u>UNITED STATES' SENTENCING MEMORANDUM REGARDING
FIREARM ENHANCEMENT UNDER U.S.S.G. §2D1.1(b)(1)</u>

The United States respectfully submits this Sentencing Memorandum regarding the Sentencing hearing scheduled for May 9, 2006.  First, the government submits that defendant should receive a two-level enhancement under Section 2D1.1(b)(1) since a firearm was possessed in connection with the offense of conviction which was clearly foreseeable to defendant.  The application of the firearm enhancement would result in a total adjusted offense level of 33 (GSR: 135-168 months)(which includes a 3-level downward adjustment for acceptance of responsibility).

Second, the government submits that the applicability of an enhancement under Section 2D1.1(b)(1), a specific offense characteristic, does not preclude the applicability of the "safety valve" provision of Section 5C1.2.  The application of the "safety valve" provision and Section 2D1.1(b)(7) would result in a two-level reduction, resulting in a total adjusted offense level of 31 (GSR: 108-135) and would remove the applicability of the statutory mandatory sentence of ten years.

I.   FACTUAL BACKGROUND

At the Sentencing Hearing on May 9, 2006, the government will present evidence of the following facts through the testimony of cooperating defendant Rogelio Garcia, Sgt. Thomas Quinn of the Massachusetts State Police (MSP) and MSP Trooper Jack Foster.

A.   Expected Testimony of Rogelio Garcia:

Beginning in early 2003, Rogelio Garcia[1] began making cocaine deliveries for Valentin Martinez.  Martinez paid Garcia a $1,000 a week to deliver cocaine to several of Martinez's regular drug customers, including two individuals known as the *"Ramones."* (The "Ramones" were later identified as Carlos Rojas and defendant JOSE A. RUIZ-MORALES).[2]  To make these drug deliveries, Martinez gave Garcia a red Mercury Mountaineer which was equipped with a hidden compartment.  Garcia registered the vehicle in his name.

According to Garcia, sometime in the summer of 2003, Martinez gave the "Ramones" 20 kilograms of cocaine.  But after

---

[1] Garcia was indicted in the case of United States v. Maria Escobar et al, 04-10299-PBS, along with 29 other defendants, including co-defendants Valentin Martinez and Carlos Rojas.  Garcia pled guilty to the Second Superseding Indictment which charged him with conspiracy to distribute cocaine and a substantive count of distribution of cocaine which arose out of the factual scenario described herein.  Similarly, Valentin Martinez has pled guilty to these same offenses including a substantive count of distribution of cocaine involved the distribution of cocaine described herein.  In addition, Martinez has also pled guilty to possession of a firearm in furtherance of a drug trafficking crime; the firearm is the Uzi described herein.

[2] According to Garcia, Valentin Martinez maintained detailed ledgers of the money that was owed to him for cocaine that he distributed to his customers. On one page of a drug ledger which was later seized, there are notations about money owed to Martinez from the "Ramones."

receiving the cocaine, "Chelo" (Carlos Rojas) and his partner (RUIZ-MORALES) approached Garcia and Martinez to return the cocaine because it was poor quality. Martinez offered to exchange the bad quality cocaine with 20 kilograms of better quality cocaine. To make the exchange, Rojas and Martinez swapped cars. Rojas and Ruiz-Morales took Garcia's vehicle, a red Mountaineer, and Garcia and Martinez took Rojas vehicle, a Buick which was equipped with a hidden compartment to store drugs. The "hide" was capable of holding more than 20 kilograms of cocaine.

Garcia and Martinez drove to 17 Farm Avenue in Peabody, a location the organization used to stash cocaine. At the stash house at 17 Farm Avenue, Garcia and Martinez loaded 20 kilograms of cocaine into the hidden compartment of the Buick. Garcia also saw Martinez put a Uzi machine gun into the same hidden compartment. Garcia drove the Buick to a nearby Dunkin Donuts in Peabody where he (Garcia) swapped vehicles with Rojas and defendant RUIZ-MORALES. Garcia latter learned from Martinez that the police had seized the cocaine that Garcia had distributed to the "Ramones."

    B.    <u>Expected Testimony of MSP Sgt. Thomas Quinn and Troper Jack Foster</u>:

In July 2003, MSP Sgt. Thomas Quinn of the received information from a confidential informant (CI) that Carlos Rojas,

a.k.a "Chelo"[3] and his partner (who was later identified as defendant JOSE RUIZ-MORALES) were receiving a large shipment of cocaine.  Based on this information, Sgt. Thomas Quinn caused a pole surveillance camera to be installed outside one of Rojas's suspected stash house's, 3620 Mystic Valley Parkway, #707, in Medford, MA.  MSP also obtained a state search warrant to install a real-time GPS tracker on the suspected stash car, a 1999 Buick Park Avenue, with MA license plate, 1256YI, which at the time was registered to MiGuelina A. Rosario of 11 Franklin Street, Apt. 1, Hyde Park, MA.

On July 24, 2003, based on information from the GPS device, MSP tracked the Buick Park Avenue to 60-62 Jefferson Avenue in Salem.  This address took on added significance because a business at that location, Bob's Carburetor, had been identified as a hang-out location for the targets of DEA's investigation into a Mexican trafficking organization in Lynn.  One of the members of this organization was later identified as Valentin Martinez.  The Buick stayed at 60-62 Jefferson for about a hour and then traveled to 17 Farm Avenue in Peabody.

The Buick then traveled to a Dunkin Donuts a short distance away.  MSP Trooper Jack Foster established physical surveillance at this location and observed a Hispanic male, who was later identified as Rogelio Garcia, sitting inside the Dunkin Donuts

---

[3]Carlos Rojas was indicted in the Second Superseding Indictment in United States v. Maria Escobar, 04-10299-PBS and is currently a fugitive.

looking out the window. A short time later, Trooper Foster saw two Hispanic males, later identified as Carlos Rojas and JOSE RUIZ-MORALES arrive at the Dunkin Donuts in a red Mercury Mountaineer. Trooper Foster then watched as Garcia and Rojas and RUIZ-MORALES switched cars; Garcia left in the red Mercury Mountaineer and Rojas and RUIZ-MORALES left in the Buick.

A short time later, MSP troopers, including Sgt. Quinn, conducting surveillance observed RUIZ-MORALES carry a brief case from Apartment #707 to parking lot and meet with Rojas near the 1999 Buick in the parking lot. Moments later, RUIZ-MORALES walked back into the apartment with the same suitcase, but this time it appeared to be heavy. Videotape surveillance from the pole camera captured RUIZ-MORALES carrying the briefcase into Apartment #707.

Physical and video surveillance was maintained on the residence until approximately 6:35 p.m. the next day, July 25th, when troopers observed RUIZ-MORALES depart the apartment with a heavy gym bag. Troopers observed RUIZ-MORALES carry the gym bag to a Jeep Grand Cherokee (1994, MA Registration 72K-L03) which was parked in the visitor's lot. RUIZ-MORALES drove the Jeep around the corner to the Mystic Mall, got out of the vehicle, but never returned (apparently because RUIZ-MORALES had spotted police surveillance). Troopers looked inside the abandoned Jeep and saw the same gym bag in the back seat floor boards. A K-9 dog alerted to the car. Troopers then obtained a state warrant

for the vehicle and found seven (7) kilograms of cocaine in the bag.

After finding the seven kilograms in the Jeep Cherokee, troopers obtained a warrant for 3620 Mystic Valley Parkway, #707. The warrant was executed the next morning on July 26th. Troopers seized an additional ten (10) kilograms of cocaine inside the apartment. In addition, troopers seized a suitcase identical to the one troopers observed RUIZ-MORALES carrying to and from the apartment. Inside the suitcase, troopers found three firearms: a loaded 9 mm handgun, a loaded Taurus 9 mm semi-automatic handgun, and a fully automatic UZI 9 mm handgun. Troopers also found 2 boxes of ammo, two digital scales, a prescription bottle in the name of Carlos Rojas, and personal papers in the name of Rojas and RUIZ-MORALES. Troopers found and arrested RUIZ-MORALES in Lynn hours later. At the time of his arrest, RUIZ-MORALES had the keys to apartment #707 in his possession.

## II.  LEGAL STANDARD

A.  Relevant Conduct for "Jointly Undertaken Criminal Activity"

Under Section 1B1.3 of the U.S. Sentencing Guidelines, the offense level, including specific offense characteristics, is determined by the defendant's relevant conduct. However, "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" should

be considered in determining the base offense level. U.S.S.G. §1B1.3(a)(1)(B); <u>United States v. Marino</u> 277 F.3d 11, 37 (1st Cir. 2002). In sentencing a defendant in a jointly undertaken criminal activity case:

> the district court must determine (1) the scope of the joint criminal activity explicitly or implicitly agreed to by [the defendant] jointly with others; (2) whether the criminal acts proffered as relevant conduct were in furtherance of the jointly undertaken criminal activity; and (3) whether the proffered acts were reasonably foreseeable in connection with that criminal activity.
>
> <u>Marino</u>, 277 F.3d at 37, <u>citing</u> <u>United States v. Carrozza</u>, 4 F.3d 70, 78-79 (1st Cir.1993).

<u>See also</u> <u>United States v. Flores-Rivera</u>, 56 F.3d 319, 331 (1st Cir. 1995)("In the case of jointly undertaken criminal activity - whether or not charged as a conspiracy - relevant conduct includes all acts reasonably foreseeable by the defendant and committed in furtherance of the jointly undertaken activity"). "When conducting a relevant conduct analysis, the district court need only find that the relevant conduct occurred by a *preponderance* of the evidence." <u>Marino</u>, 277 F.3d at 37, <u>quoting</u> <u>United States v. Caba</u>, 241 F.3d 98, 101 (1st Cir.2001)(emphasis added).

B.   <u>The Firearm Enhancement</u>

Under Section 2D1.1(b)(1),"[i]f a dangerous weapon (including a firearm) was possessed," the offense level is increased by two levels. Furthermore, the Sentencing Guideline commentary to this provision provides in pertinent part:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons.  The adjustment should be applied it the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at this residence, had an unloaded hunting rifle in the closet.
>
> U.S.S.G. §2D1.1(b)(1), comment. (n.3).

Following the principles of relevant conduct for jointly undertaken criminal activity, "the enhancement for possession of a dangerous weapon requires that it was reasonably foreseeable that a co-conspirator would possess a gun in furtherance of the criminal activity." United States v. Casas, 356 F.3d 104, 130 (1st Cir. 2004), citing United States v. Mena-Robles, 4 F.3d 1026, 1036 (1st Cir.1993).  "The defendant need not have himself possessed the weapon."  Id. at 104, citing United States v. Berrios, 132 F.3d 834, 839 (1st Cir.1998).

Furthermore, in order for the enhancement to apply, the government is not required to prove the defendant's actual knowledge of the firearm.  See United States v. Humphrey, 208 F.3d 1190, 1211 (10th Cir. 2000)(co-conspirator's possession of firearm foreseeable, despite lack of actual knowledge, based on relationship between co-defendant and convicted defendant); United States v. Alred, 144 F.3d 1405, 1420 (11th Cir. 1998)("[a]ctual knowledge of the conspirator's firearm possession by the convicted defendant is not required for the enhancement to apply, but possession must be reasonably foreseeable); United

States v. Aguilera-Zapata, 901 F.2d 1209, 1215-16 (5th Cir. 1990)(since firearms are tools of the trade of those engaged in illegal drug activities, sentencing courts can infer that a defendant should have foreseen a co-defendant possession of firearm).  Instead, as stated above, in the case of jointly undertaken criminal activity, the possession of a firearm by a co-defendant need only be foreseeable to the defendant and within the scope of his conspiratorial agreement.  Id.

Unlike Section 5C1.2 of the Sentencing Guidelines (the "safety valve" provision) which, to apply, requires that "the defendant did not . . . posses a firearm or other dangerous weapon," Section 2D1.1(b)(1) was purposely was written in the passive voice: "a dangerous weapon (including a firearm) was possessed."  When a Guideline provision speaks in the passive voice, Courts generally consider it to refer to "an offense characteristic, not a characteristic of the individual defendant."  United States v. Lewis, 93 F.3d 1075, 1084 (2d Cir. 1996), quoting United States v. Rosa, 17 F.3d 1531, 1552 (2d Cir. 1994); see also In re Sealed Case (Sentencing Guidelines "Safety Valve"), 105 F.3d 1460, 1462-63 (D.C. Cir. 1997)(holding that the co-defendant's possession of a firearm does not preclude the application of the safety valve despite application of firearm enhancement noting difference between passive voice of "was possessed" in Section 2D1.1(b)(1) and the active voice of Section 5C1.2 requiring the defendant to do the possessing). Accordingly,

a firearm enhancement under Section 2D1.1(b)(1) based on co-conspirator liability does not preclude the application of the safety provision which prohibits the defendant himself to possess (or induce a participant to possess) a firearm.  United States v. Figueroa-Encarnacion, 343 F.3d 23, 34 (1st Cir. 2003).

Furthermore, while there must be a certain nexus between the weapon and the offense for the enhancement to apply, it is well settled in the First Circuit that "when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business, there will be sufficient evidence to connect the weapon(s) to the offense conduct."  United States v. McDonald, 121 F.3d 7, 9 (1st Cir.1997), quoting United States v. Corcimiglia, 967 F.2d 724, 727 (1st Cir.1992)(internal quotations omitted)(holding that the two-level enhancement was appropriate where drugs, cash and drug scales were found in defendant's parlor and a gun was found in a secret compartment in defendant's bathroom vanity)).

### III.  ARGUMENT

Applying these legal standards, the firearm enhancement should be applied in this case.  First, there is no question that defendant RUIZ-MORALES was engaged "jointly undertaken criminal activity" with Carlos Rojas, Valentin Martinez, and Rogelio Garcia.  Furthermore, although a conspiracy need to not be charged, defendant pled guilty to a drug conspiracy which

involved the seizure of cocaine on July 25, 2003.  Furthermore, at the sentencing hearing, the government will establish that there was an ongoing drug business relationship between Valentin Martinez and the "Ramones" (Rojas and defendant RUIZ-MORALES).

Second, not only was a firearm possessed; there were *three* firearms.  One firearm, an Uzi (clearly a dangerous weapon), was part of the cocaine deal.  Cooperating defendant Garica will testify that he *saw* Martinez put the Uzi in the hidden compartment with the cocaine and that Garcia gave this cocaine and firearm to Rojas and Ruiz-Morales.  The other two firearms were found in close proximity to the cocaine found in the apartment in Medford.

Third, the possession of at least one of these three firearms was clearly foreseeable to the defendant.  Defendant was engaged in a drug deal involving more than $350,000 worth of cocaine.  To exchange the cocaine, RUIZ-MORALES and his co-conspirators engaged in a sophisticated swap of cars with hidden compartments to complete the deal.  It is certainly foreseeable that one of these participants might have possession a firearm to protect the valuable illegal merchandise they seeking to exchange.  Furthermore, the facts will demonstrate that the three firearms were found in the briefcase which defendant was observed carrying to and from the apartment in Medford.  Therefore, a very reasonable inference is that defendant did in fact have actual possession of the firearm.  If the Court makes a finding that the

defendant had knowing possession of the firearm, the "safety valve" provision of Section 5C1.2 will not apply.

Fourth, the possession of the firearm was within the scope of defendant's conspiratorial agreement. The conspiracy to which defendant pled guilty encompasses a discrete event: the distribution of cocaine from Martinez and Garcia to Rojas and RUIZ-MORALES in July 2003. In this case, moreover, at least one firearm was actually part of the deal; the Uzi was added to the cocaine and was part of the transaction.

IV.  CONCLUSION

According, the government submits that the Court should increase the defendant's offense level by two points due to the possession of a firearm under Section 2D1.1(b)(1).  The government will defer to the Court regarding the applicability of the safety valve provision, which will depend upon the evidence produced about the defendant's actual knowledge of a firearm.

                                Respectfully submitted,

                                MICHAEL J. SULLIVAN
                                United States Attorney

                    By:   /s/ Neil Gallagher
                          Neil J. Gallagher, Jr.
                          Assistant U.S. Attorney

Dated: May 4, 2006

<u>Certificate of Service</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ Neil J. Gallagher, Jr.</u>
Neil J. Gallagher, Jr.